UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
LAREDO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| VS. | § | CRIMINAL ACTION NO. 5:19-CR-1346-1 |
| | § | |
| EDWARD LEE PUGA | § | |

## MEMORANDUM AND ORDER

Before the Court is Defendant's Motion to Suppress, which challenges "the detention, search and seizure of the Defendant's vehicle, its occupants, the Defendant and co-Defendant" (Dkt. No. 53).

The Court held an evidentiary hearing on October 31, 2019. At that hearing, the Government introduced a recording of a 911 call and offered the testimony of Lieutenant Fernando Hernandez, Jr., Investigator Ramon Arambula, and Investigator Juan Molina of the Zapata County Sheriff's Office. Defendant introduced a video from a police body-worn camera but did not call any witnesses.

Having carefully considered the evidence, the parties' arguments, and the applicable law, the Court finds that the Government has not met its burden to establish reasonable suspicion to stop, search, or seize Defendant. Therefore, Defendant's motion to suppress (Dkt. No. 53) is **GRANTED**.

1

## BACKGROUND[1]

On August 2, 2019, at 4:09 p.m., the Zapata County Sheriff's Office received an anonymous 911 call about a suspicious vehicle near the Falcon Lake Tackle Shop on Highway 83, just south of Zapata. The caller stated:

> I don't know if it's really an emergency. I was coming up to the … Falcon Lake Tackle Shop, and … there's a white Lincoln parked on the side of the road. They had a bunch of trash thrown out of their car…. [T]here were four guys, and they're very, very suspicious guys. I pulled up and asked them about the trash that they threw out of their car, and one of them had a knife on him and he starts getting out and he starts picking up the trash and starts saying, "I'm sorry I'm sorry I didn't mean it I didn't mean it" and just acting very suspicious, but they drove off

(Dkt. No. 62-1 at 3, 8). The caller specified that the vehicle was an "older Lincoln" and stated that it was headed toward Zapata (*id.* at 8). He did not give his name, and the 911 system did not record his phone number or location (*id.* at 3, 8).

The Sheriff's Office dispatched three patrol units, which consisted of Lieutenant Fernando Hernandez, Investigator Ramon Arambula, and Investigator Juan Molina, to search for the Lincoln (Dkt. No. 74 at 28). The officers were not given any information about the caller but only a general description of a car that had been "reported littering" (*id.* at 24).[2] About five minutes later, Hernandez spotted an older-model, white Lincoln parked in front of the Dollar General store on Highway 83, which was just north of where the alleged littering had occurred (*id.* at 10–11).

---

[1] The facts in this section reflect the evidence presented at the suppression hearing.

[2] Hernandez testified that the caller's statement that the suspects had picked up their trash "kind of negate[d] the allegation of littering" (Dkt. No. 74 at 25–27).

2

Hernandez, who was in uniform, parked his marked patrol unit near an entrance to the parking lot. He could see "nothing unusual" about the Lincoln: it was relatively clean, displayed "regular license plate[s]," and had normal windows and suspension (*id*. at 12, 29–31). Three men were sitting in the backseat with the engine idling, but no one was in the front (*id*. at 12, 31). The backseat passengers did not appear in any distress, nor did they try to "hide" or "cover their faces" as Hernandez approached (*id*. at 33–34).[3]

Hernandez started "knocking pretty loud" on the Lincoln's rear driver-side window. The passengers, however, did not acknowledge him, which Hernandez "consider[ed] suspicious." Hernandez "kept on knocking" on the window, yet the passengers continued to ignore him. Finally, Hernandez loudly "instructed them to open the door, and they opened the [rear driver-side] door" (*id*. at 13–14, 31–32).

What followed is not entirely clear. On direct examination, Hernandez testified that the passengers were "sweating" and wearing clothes that looked as though they had "just crossed [the border]." Based on his training and experience, Hernandez concluded that the passengers were undocumented aliens (Dkt. No. 74 at 14).[4] The defense, however, introduced video footage from a police body-worn camera.[5] The video shows the backseat driver-side passenger wearing clean, white

---

[3] Hernandez testified that it is not unusual for passengers to wait in a car while the driver goes into a store (Dkt. No. 74 at 32).

[4] In his 19-year career, Hernandez had participated in over 40 "encounters with aliens or alien smuggling." Zapata is about three miles from the Mexican border, and Highway 83 is known as a "busy alien smuggling corridor" (Dkt. No. 74 at 8–9, 23).

[5] The camera was worn by Corporal Jose A. Lozano, who arrived on the scene shortly after Hernandez (Dkt. No. 74 at 36).

sneakers and otherwise dressed neatly in jeans, a t-shirt, and a baseball cap. The other passengers do not appear disheveled either, though the video does not show them clearly (Dkt. No. 63-1). Confronted with this footage on cross examination, Hernandez agreed that the driver-side passenger did not appear sweaty or dirty. "If I'm not mistaken," Hernandez clarified, "the one in the middle [ ] was pretty unsanitary I think" (Dkt. No. 74 at 52).

Hernandez proceeded to question the backseat passengers, who informed him in Spanish that the driver and front passenger were in the dollar store. At that point, Investigators Arambula and Molina arrived on the scene (*id.* at 14–15, 30). One of them parked behind the Lincoln, and the other parked "facing the side of the [Lincoln]" and blocking it in (*id.* at 30, 34). Hernandez advised them that the backseat passengers might be undocumented and told them to look for the driver and front passenger in the store (*id.* at 15, 55, 68).

Zapata is a "small town," so it is "easy" for the police to identify people who do not belong there (*id.* at 75). When the investigators entered the store, they noticed two men, later identified as Defendant and co-Defendant Juan Manuel Martinez, in line at the cash register (*id.* at 69).[6] Molina observed that, when Defendant and Martinez saw the officers, they made a "small movement" in the direction of an employees-only office, as if to hide there (*id.* at 77).[7]

---

[6] The investigators wore civilian clothing but displayed badges and carried guns, radios, and handcuffs (Dkt. No. 74 at 57, 70). At the hearing, they identified Defendant as one of the two suspects but could not otherwise distinguish Defendant from Martinez (*id.* at 58, 64, 75–76).

[7] Specifically, Molina testified on direct that Defendant and Martinez started to walk toward the office (Dkt. No. 74 at 69). But, on cross, he testified that it was only a "small movement"—not "two or three steps" (*id.* at 77).

4

Events then moved quickly. Arambula stayed by the door in order to "avoid anybody leaving," while Molina approached the suspects and immediately escorted Martinez outside (*id.* at 63, 78). Meanwhile, Hernandez entered the store after more officers arrived on the scene. He escorted Defendant outside right behind Martinez (*id.* at 15). As the suspects were being removed from the store, the officers asked which of them was the driver of the Lincoln. Defendant and Martinez began to accuse each other of being the driver. One of them even claimed that he was asleep when the other one picked up the backseat passengers (*id.* at 17–19, 40).

Outside, Molina and Arambula handcuffed Martinez and conducted a pat-down search (Dkt. Nos. 63-1; 74 at 41). They recovered a "makeshift crack pipe" and an electronic device that Martinez had apparently stolen from the dollar store (*id.* at 59, 72). Hernandez did the same with Defendant but did not recover any contraband (*id.* at 45–47).[8]

Defendant and Martinez were subsequently indicted for transporting undocumented aliens, and Defendant filed the instant motion arguing that the police seized his vehicle, his passengers, and himself without reasonable suspicion. The Government counters that the evidence "builds" on itself to establish reasonable suspicion and points to the anonymous 911 call, the statements and appearance of the backseat passengers, and Defendant's suspicious behavior in the store (Dkt. No. 74 at 99).

---

[8] The police never recovered a knife (Dkt. No. 74 at 26). Further investigation revealed that the Lincoln was registered to Rebeca Rosales Puga (Dkt. No. 62-1 at 7).

5

## II. DISCUSSION

"The stopping of a vehicle and detention of its occupants constitutes a 'seizure' under the Fourth Amendment." *United States v. Brigham*, 382 F.3d 500, 506 (5th Cir. 2004). An investigative seizure is allowed under *Terry v. Ohio,* 392 U.S. 1 (1968), "only when [an] officer has a reasonable suspicion supported by articulable facts that criminal activity may be afoot." *United States v. Bustamante*, 478 F. App'x 922, 924–25 (5th Cir. 2012) (quoting *United States v. Martinez,* 486 F.3d 855, 861 (5th Cir. 2007)). The Government has the burden to prove reasonable suspicion. *Id.* (citing *United States v. Gomez,* 623 F.3d 265, 269 (5th Cir. 2010)).

### A. The anonymous 911 call is unreliable.

The Government argues that the 911 call was reliable enough to justify a seizure of the Lincoln (Dkt. No. 74 at 84, 104). "Whether a 911 call provides reasonable suspicion to justify a stop is determined on a case-by-case basis," *Gomez*, 623 F.3d at 269, but the Supreme Court has been skeptical of anonymous tips. In *Florida v. J.L.*, 529 U.S. 266, 268 (2000), for example, the police were tipped off that a "young black male standing at a particular bus stop and wearing a plaid shirt was carrying a gun." Officers responded to the bus stop and saw a young black male wearing a plaid shirt. Based on the anonymous tip alone, the officers frisked him and found a gun in his pocket. *Id.* The Court held that the police lacked reasonable suspicion because the anonymous tip provided "no predictive information" that the police could use to "test the informant's knowledge or credibility." *Id.* at 271. The Court emphasized that the tipster "neither explained how he knew about the gun nor

6

supplied any basis for believing he had inside information" about the suspect. *Id.* at 271. Although the tip accurately described the suspect's location and appearance, the Court explained, information must be "reliable in its assertion of illegality, not just in its tendency to identify a determinate person." *Id.* at 272; *see also Martinez*, 486 F.3d at 864 (an otherwise unreliable anonymous tip will not justify a *Terry* stop though the police corroborate a "mountain of innocent data").

Yet the Court reached the opposite conclusion in *Navarette v. California,* 572 U.S. 393 (2014). In that case, an anonymous 911 caller reported that a Ford F-150 pickup truck with a certain license plate number had just run her off the highway. The police quickly identified a vehicle matching the caller's description, pulled it over, and discovered 30 pounds of marijuana. *Id.* at 395. The Supreme Court found reasonable suspicion based on several factors: (1) the 911 call reported "dangerous behavior[ ]" as opposed to a "minor traffic infraction"; (2) the report was consistent with drunk driving and, as such, involved an "ongoing crime … as opposed to an isolated episode of past recklessness"; (3) the caller made a specific allegation as opposed to a "conclusory allegation of drunk or reckless driving"; (4) the caller's information was based on personal observation; and (5) the caller used the 911 system, which can identify and trace callers. *Id.* at 399–403.

This case is much closer to *J.L.* than *Navarette*. The description of the vehicle's occupants as "very suspicious" is precisely the type of vague and conclusory allegation that the Supreme Court has found unreliable. *See Navarette*, 752 U.S. at 403. The caller also did not claim "inside" or "predictive" information about future criminal

7

conduct. *See J.L.*, 529 U.S. at 271; *cf. Bustamante*, 478 F. App'x 922. And the caller's allegations of knife possession and littering do not amount to a dangerous or exigent situation that necessitates a traffic stop. *See J.L.*, 529 U.S. at 273–74 (anonymous report of illegal gun possession does not allege a "danger … so great as to justify a search").

*Navarette* does not even apply on its own terms because a past incident of littering is not an ongoing crime. *See Navarette*, 572 U.S. at 402 n.2 (declining to consider whether stop can be "justified … to investigate completed criminal activity"). Indeed, as Lt. Hernandez acknowledged (Dkt. No. 74 at 25–27), that the suspects reportedly picked up their litter meant there was no longer a crime to investigate at all. The caller's information was reliable, therefore, only in the "limited sense" that it tended to "identify a determinate person," which by itself does not establish reasonable suspicion. *J.L.*, 529 U.S. at 272; *Martinez*, 486 F.3d at 864. Thus, the anonymous 911 call did not allege the sort of specific, dangerous, and ongoing criminal activity to justify a stop.

### B. The police illegally seized the Lincoln and the backseat passengers.

The Government also argues that the interaction between Lt. Hernandez and the backseat passengers was not a "seizure" but rather a "consensual encounter" for which no justification was needed (Dkt. No. 74 at 81). "Consensual encounters in which an individual voluntarily and willingly agrees to speak to the police are not seizures and may be initiated by the police without probable cause or reasonable suspicion." *United States v. Fernandes*, 285 F. App'x 119, 122–23 (5th Cir. 2008).

Whether an interaction is a seizure or a consensual encounter depends on whether, "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Brendlin v. California*, 551 U.S. 249, 255 (2007). The test may also be framed as whether a "reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter." *Id.*

The interaction between Lt. Hernandez and the backseat passengers quickly escalated into a seizure. Because the car was already parked, Hernandez was free to approach it, try to talk to the passengers, and even tap on the window to attract their attention. When the passengers did not respond, however, Hernandez continued to knock on the window "pretty loud" and "very hard" (Dkt. No. 74 at 14, 32). When the passengers still ignored him, Hernandez loudly "instructed them to open the door" (*id.* at 13, 32). This show of authority—inconsistent with a consensual encounter—made it clear that the passengers were not free to disregard the officer's commands and would not be left alone until they acquiesced. Thus, a seizure occurred when the passengers complied with Hernandez's command to open the door. *See Johnson v. Campbell*, 332 F.3d 199, 206 (3d Cir. 2003) ("Although Johnson may have felt free to decline … [the officer's] initial request to roll down the window, the very next moment, when [the officer] persisted rather than accepting Johnson's choice not to acquiesce, the interaction became a stop.").[9]

---

[9] The Government's reliance on *Florida v. Bostick,* 501 U.S. 429 (1991), and *I.N.S. v. Delgado*, 466 U.S. 210 (1984)—which held that random drug and immigration sweeps do not implicate the Fourth Amendment—is misplaced. As the Fourth Circuit has explained in rejecting a similar argument, those cases did not involve "particularized suspicion of wrongdoing among any of the [individuals] questioned…. And in *Bostick*, the police officers specifically advised the defendant that

9

The Court also finds that the seizure violated the Fourth Amendment. Apart from the anonymous 911 call, which was wholly unreliable, the Government has not identified any facts or circumstances that gave rise to reasonable suspicion. Hernandez testified that there was "nothing unusual" about the Lincoln or about passengers sitting in a parked car in the parking lot of a store. Thus, prior to the seizure, Hernandez "observed nothing that made [him] reasonably suspect" that the vehicle or the backseat passengers "had committed, [were] committing, or [were] about to commit a criminal act." *United States v. Monsivais*, 848 F.3d 353, 358 (5th Cir. 2017).[10]

Lastly, the Court finds that Defendant has standing to challenge the unlawful seizure because it interfered with his reasonable possessory interest in his car. *See Segura v. United States*, 468 U.S. 796, 806 (1984) ("Different interests are implicated by a seizure than by a search": a seizure affects a person's "possessory interests," while a search affects a person's "privacy interests"). That determination follows from two well-established principles.

First, a person has standing to challenge the seizure of property in which he has a possessory interest. A defendant generally has a possessory interest in a car if

---

he had the right to refuse consent to any search." *United States v. Jones*, 678 F.3d 293, 304 (4th Cir. 2012) (cleaned up and citations omitted).

[10] Contrary to the Government's argument, the balancing test in *United States v. Brignoni-Ponce*, 422 U.S. 873 (1975), is a red herring. Although Hernandez suspected the Lincoln was involved in alien smuggling *after* the backseat passengers complied with his command to open the door, the Court may not consider facts that were unavailable to the officer "at the moment of the seizure." *Terry*, 392 U.S. at 21. While some of the *Brignoni-Ponce* factors were met in this case—Zapata is close to the border, and Highway 83 is a common corridor for alien smuggling—an "individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion." *United States v. Hill*, 752 F.3d 1029, 1035 (5th Cir. 2014).

he is "in possession of the car, has the permission of the owner, holds a key to the car, and has the right and ability to exclude others, except the owner." William E. Ringel, *Searches and Seizures, Arrests and Confessions* § 11:20 (Nov. 2019) (citing cases); *see also United States v. Hernandez*, 647 F.3d 216, 219 (5th Cir. 2011) ("Standing does not require an ownership interest in the invaded area."). Here, the Lincoln was registered to Rebeca Rosales Puga (Dkt. No. 62-1 at 7), who is presumably related to Defendant. Moreover, when the seizure occurred, Defendant had temporarily left the car with the engine running to go into a store. The evidence shows that Defendant intended to return shortly and continue driving. As a result, the seizure significantly interfered with Defendant's continued possessory interest in his car.

Second, a vehicular seizure is a single event that affects the Fourth Amendment interests of everyone involved. In *Brendlin*, for example, the Supreme Court held that a passenger who could not challenge a search of a vehicle could still challenge a seizure, which "curtails the travel a passenger has chosen just as much as it halts the driver." 551 U.S. at 251, 257. The Court refused to examine whether the seizure primarily targeted the driver or the passenger and explained that, because the seizure affected everyone in the vehicle, the passenger's challenge was directed at a violation of his own Fourth Amendment rights. *Id.* at 257. The same logic applies here. Although Hernandez seized both the Lincoln and the backseat passengers, those were not separate events but a single seizure that interfered with Defendant's and the passengers' interests alike. *United States v. Mosley*, 454 F.3d 249, 258 n.14, 267 (3d Cir. 2006) (a seizure is a "single act, which affects equally" the

car and the occupants). Accordingly, Defendant's challenge is directed at a violation of his own Fourth Amendment rights.

**C. The police illegally seized Defendant when they entered the store.**

Having concluded that the anonymous call was unreliable and that the police lacked reasonable suspicion to seize the Lincoln, the Court now must determine whether the police had reasonable suspicion to seize Defendant. Notably, the Government does not attempt to defend the lawfulness of a seizure from the moment the police entered the dollar store. Instead, the Government insists that the encounter remained consensual until Defendant was "brought outside" (Dkt. No. 74 at 82, 83, 99). Because the Court finds that a seizure occurred when the police entered the store, however, it also must find that the seizure was not supported by reasonable suspicion. *See Terry*, 392 U.S. at 21 (court may consider only facts available "at the moment of the seizure").

Before the officers entered the store, Hernandez was already convinced that the backseat passengers were undocumented aliens and the driver was involved in alien smuggling. From the outset, then, the interaction between Defendant and the police was not the type of random or routine questioning that often typifies a consensual encounter. Similarly, at no point did the officers ask whether Defendant was willing to answer questions or inform him that he had the right not to cooperate. *See Jones*, 678 F.3d at 303 (officers "did not ask" to speak with defendant, which is "the routine practice of officers seeking to engage in a consensual encounter").

In addition, the police approached Defendant in force. Three officers—Hernandez, Arambula, and Molina—entered the store about the same time. More officers stood outside by the Lincoln, whose presence Defendant could see from inside the store (Dkt. No. 74 at 17–18). Then Arambula guarded the door in order to "avoid anybody leaving"—which by itself would have convinced a reasonable person that he was not free to go—while Molina and Hernandez immediately escorted Defendant and Martinez outside (*id.* at 65, 78). Any reasonable person would have concluded from law enforcement's show of authority that he was not free to disregard the officers' commands or terminate the encounter. *See, e.g., United States v. Reid*, No. 17-CR-20172-SHL, 2018 WL 3056696, at *3 (W.D. Tenn. Mar. 6, 2018) ("[A] *Terry* stop commenced when [the officer], after following [the defendant] inside the store … grabbed [the defendant] and escorted him outside.").

Although Defendant and Martinez acted suspiciously when they began accusing each other of being the driver of the Lincoln, the Court finds that their suspicious behavior started while the police were removing them from the store and, therefore, after a seizure had occurred (*see* Dkt. No. 74 at 18). Molina even acknowledged that, by the time the suspects began blaming each other, he had already touched Martinez's back to direct him outside (*id.* at 74). *See United States v. Mask*, 330 F.3d 330, 337 (5th Cir. 2003) (factors that indicate a seizure include "the threatening presence of several officers" and "physical touching of the [defendant's] person"). As a result, the Court may not consider Defendant's suspicious behavior in evaluating whether the seizure was justified. *United States v. Richmond*, 915 F.3d

13

352, 359 (5th Cir. 2019). Because the police lacked reasonable suspicion when they entered the store—which the Government does not dispute—Defendant's seizure violated the Fourth Amendment.

**III. CONCLUSION**

Although the Court recognizes the difficult job that law-enforcement professionals voluntarily undertake, the Fourth Amendment does not permit them to detain individuals without specific and reasonable suspicion. When an anonymous tip does not establish reasonable suspicion, officers have "many tools at their disposal to gather additional evidence that could satisfy the requirements of *Terry*," including "investigation, surveillance, and even approaching the suspect without a show of authority to pose questions and to make observations about the suspect's conduct and demeanor." *United States v. Lowe*, 791 F.3d 424, 435–36 (3d Cir. 2015). But in this case, law enforcement used an anonymous 911 call that vaguely reported "suspicious" behavior and possible littering to seize five people without further investigation. Defendant's Motion to Suppress (Dkt. No. 53) is therefore **GRANTED**. All evidence that resulted from the unconstitutional seizures is hereby **SUPPRESSED**.

It is so **ORDERED**.

**SIGNED** December 24, 2019

Marina Garcia Marmolejo
United States District Judge